This is a carryover of a case from a prior sitting in which Judge Hardiman agreed to finish it for our departing Judge Manasky. So again, Judge Hardiman, thank you very much for jumping into the fray. My pleasure. Great to be with you. And same here. We have the cases 18-1821, Zhu Feng vs. University of Delaware, Ms. Denzel and Mr. Taylor. Is it Denzel or Denzel? Denzel. Denzel. Okay, I'm sorry. Whenever you're ready. May it please the court. My name is Stephanie Denzel on behalf of Appellant Mr. Feng. We are here to ask the court to reverse the district court's grant of summary judgment on all of Mr. Feng's claims. Before I begin, I'd like to reserve four minutes. That's fine. While all of our points are briefed in the documents in front of you, I'd like to focus on three key points in my argument today. First, whether comparative evidence is required. Is there any kind of federal requirement that requires him to take a certain number of courses? I thought it was federal immigration law that required him to take a certain number of courses, but maybe I'm wrong. So Mr. Feng was on an F-1 student visa. Based on what's in the record, that does require him to be full-time at the university. The university determines what is full-time. For students in the program that he was in, he was told that full-time was the six credits over the summer, the three credits in the fall, and three credits in the spring. What about the other students in the same program? You're talking about Mr. Feng, who is from China, I believe? Yes. What about the other students in the program? What are the requirements that they have to complete? They are only required to be enrolled in those six credits in the summer, the three in the fall, and the three in the spring. And Mr. Feng was told... So the standard full-time student is six credits in the summer and three credits the rest of the year. For that particular program in which he was enrolled. Three in the fall and three in the spring. Three in the fall and three in the spring. Yes. So my understanding is it was a program for either current teachers or professionals who were pursuing a teaching degree. So as presented to Mr. Feng, that was the full program. So he was then required to take nine credits. That's correct. He was required to take three times the number of credits when the fall term came around. And that was the first time at which he had learned that, in fact, rather than being admitted to that program, being permitted to take just those three credits, he was going to be required to take nine. Do you know the basis of that? Yeah. What was the basis of that? The university required nine, you're saying? He was under the impression that the university was requiring nine, that they adopted that as a requirement. They said it came from the student visa requirements. It's not in the record. My understanding, though, is that an F-1 visa, the university makes the determination as to what full-time is and the students required to be full-time. But, again, that's sort of an area of immigration law that wasn't ventured into in this case. So I'm a little lost. If immigration law requires that you be a full-time student and you're saying that a full-time student at the University of Delaware would be six in the summer for this program, three in the fall, three in the spring, and yet you're saying that in the fall they required him to take nine? Yes. So in the fall, that is when they told him instead of being able to be full-time in this program, all of a sudden he needed to be a full-time graduate student across all other programs, which requires nine credits. But you don't know the basis for the nine credit requirement? That is what the University of Delaware told him was going to have to be full-time for the purposes of his visa. So are you arguing that the wrong comparators are used in this case? Or are you arguing that this was discriminatory? Both. So I think there are a couple of comparator-related arguments, one being that comparators are not required under the standard, that it's simply circumstances that give rise to an inference of discrimination, but also that we did present comparator evidence, they were just looked at at the wrong point in time after the discriminatory actions were taken. And one of the discriminatory actions was forcing Mr. Fang, who had been told in this program that he was going to be full-time with those three credits, to all of a sudden take three times as many credits as the other students. Were there any other non-national students in the program? Not at the time that he was in it. He was the only foreign national? That's correct. Is this a direct evidence case or an indirect evidence case? We believe that there's an argument that the requirement that he, as an international student, take three times as many credits is on its face discriminatory. But I think the bulk of the argument has focused on the indirect aspect. I would think so because, I mean, the evidence of direct intentional discrimination, at least from what I'm seeing on the record, I didn't see it there. It would seem to be more of an indirect evidence case. Was he required to take more for whatever reason? They tried to work with him, made suggestions, and things didn't work out, and maybe there was a miscommunication when he went back to China, etc. But it doesn't seem like it's the kind of case one normally sees for direct discrimination. I think the only direct piece would be that facial piece of, you, as an international student, have to take nine credits to be full-time, even though you're enrolled in this program where everybody else gets to be considered full-time for free. If that's true, what would be the correct analysis? If it's direct discrimination. Of course, he's a national, he has to do nine, whereas the non-nationals have to take three credits. I mean, I think that would be the evidence of intentional. Well, in other words, is it Pricewaterhouse or McDonnell Douglas? Yeah. I think, honestly, the bulk of the argument focuses on McDonnell Douglas because I think the briefing in the district court did not go in-depth into the direct and the facial challenge as it could have. So we don't look at this case in terms of strict scrutiny? I think, at this point, we are looking primarily at the McDonnell Douglas analysis. OK. Well, I guess then, what did the district court do wrong? So in terms of the McDonnell Douglas analysis, the requirements of the McDonnell Douglas analysis set out are not meant to be rigid. And so while comparator evidence is one of the ways in which you can show evidence suggesting an inference of discrimination, it's not the only way. Well, it's also not required. That's correct. Contrary to what Judge Brenner said. And so the district court said that Mr. Fink's failure to present comparator evidence was fatal to his claim, that because that was required, essentially, it proceeded no further in analysis. And that was an error because under both Supreme Court jurisprudence and this court's rulings, comparator evidence is only one type of. But despite that. OK. Run through the McDonnell Douglas analysis as to how you think. There's a prima facie case. Sure. And we'll get from the university what its reasoning was and then whether that reasoning is pretext. OK. There's no dispute that he was a member of a protected class. He's a Chinese national, not American, foreign student. There is some dispute about the qualifications and the comparator or other evidence suggesting inference. I think what needs to be talked about first is the adverse events. University of Delaware focuses solely on dismissal as the only adverse event that occurred to him. That's the one you pleaded and argued, right? He pled. He pled. If you look at his complaint and in the briefing at the district court level, adverse events, including the being required to take an increased course load, being misled with respect to the agreement that if he had followed through on that agreement, he'd be permitted to stay. The I-20 issue where he applied to get a signature on I-20 in order to leave the country. The school needed to certify he was still a student. He asked for that certification while he was a student. He was set to return by the end of June. And the school said, go, go. We'll send it to you while you're in China. They didn't. They never intended to. And they, in fact, didn't take action to dismiss him and make him not a student until about two months later, well after he would have returned. So that's another. Before the dismissal, that was the third adverse. You argue all that on appeal. But where in your complaint is that? Where in the complaint is it? So that's in the facts. The complaint for intentional discrimination refers to the factual allegations. So you're talking about paragraphs 24 through 30 of the complaint? Yes, which refer to the allegations set forth about that. And then it was clear through discovery. But then, I mean, it's kind of a passing reference when you just have it in the facts and you don't have it in your cause of action. The cause of action focuses on the dismissal, does it not? As the end point to that circumstance. But we believe that it was clear through the complaint and through the briefing to the district court that these were a series of adverse events that the university took against Mr. Finn. So the indirect evidence you're trying to come up with is of discriminatory intent. And you're claiming that the only thing I can hear you say is that requiring nine credits or three courses in the fall was somehow discriminatory intent. There's that one. And then I think the next clearest one is probably the I-20. And just to clarify, it wasn't three credits. It was nine courses. Three courses. Nine credits. Three times three. Yeah, OK. Mr. Fang had requested the certification to go travel to China to complete some of his spring projects, which needed to be completed in China. He was going to return a couple of weeks later. The school told him to go. They would send the form he needed to get back to the US before he had to return. And then they did. They purposely delayed. I didn't see that in the record. Where do you have in the record a promise from someone at the school that they're going to sign the I-20? So that's in the email records. On A218, there's an email regarding Mr. Fang's request on May 24th for him to have the I-20 signed and admission in A225, A225. What does A218 say? That Mr. Fang asked on May 20th to have his I-20 signed before leaving the country. But I'm asking you, my question was, where in the record did Delaware promise to sign the I-20? Him asking for it is quite different than them promising to sign it, right? Correct. So in A219 is the testimony where I believe it's Miss McMillan who was in the Office of International Students who told Mr. Fang that they would and they'd send it. There's also email evidence. I can get those for you. I don't have 219 right in front of me. Would you quote me the promise there where they promised to sign it? What exactly is the language there? I don't have it in front of me now. I can get it for you on rebuttal. That would work, or I can pull it. No, we'll get you back on rebuttal. So they said they'd sign it, and I'm sorry? My thought was that the nine credit requirement just imposed on Mr. Fang was facially discriminatory, because no other student had to do nine hours. Certainly none of the domestic students. It was just Mr. Fang. I mean, it seems to me that it could be argued that it was facially discriminatory on his face. And if that's so, then was the district court correct in using the McDonnell Douglas pretext standard? So no, the McDonnell Douglas pretext standard would not have applied. So what standard would apply? What standard would apply? Well, then I think we would get into the PricewaterhouseCooper standard. But I think that the issue is that the- But the strength of your argument is that the district court imposed a necessary requirement of comparators? Yes, and I think some of this is controlled by what the University of Delaware raised in its motion for summary judgment, because they controlled the confines of the issues that were brought before the court. You don't bring a equal protection claim? No, there's not an equal protection claim. OK, thank you. We'll hear from Mr. Taylor. Good afternoon. May it please the court. Jim Taylor on behalf of the University of Delaware. Let me try to clear up what I think is some confusion about the credit requirement. The program that Mr. Fang was admitted into was designed, and I think this is not disputed in the record, and Dr. Joyce, who created the program, explained it this way. It was designed for full-time teachers. Because of that, the intent and the design was that for the first summer, and the students in the program are referred to as cohorts, when the first cohort showed up, they would take two classes during the summer. What's that word you're using? Cohort? Cohort. Cohort. An academic term, I'm sorry. So when the first cohort showed up, two classes in the summer, six credits total. And because they were primarily teachers designed to be full-time teachers who were taking this program, that worked because they could do it in the summer in person. After that, the intent was that it would be one class a semester equaling three credits. And that class could be taken remotely. That was the intent. And Dr. Joyce, who created the program, testified, and this is not disputed in the record by Mr. Feng, he testified that at the beginning of Mr. Feng's application into this program, Dr. Joyce met with him and said, do you understand this program is largely designed for full-time teachers? In fact, our intent would be that this would be perfect for an international student who was teaching overseas, who could come here for our first summer and then continue in the program wherever that student might reside, whether that's England or China. And in fact, one teacher from New York, an American, did precisely that. Dr. Joyce said that teacher came to Delaware, University of Delaware's campus in Newark, for the first summer and the first summer only. And thereafter, participated completely via remote access. The nine credit requirement that you're hearing about is purely a feature of immigration law. And two things. I believe that I heard my friend on the other side say there's nothing in the record. I believe I heard these words. Nothing in the record about the actual immigration requirement. Do you mean it's immigration law that imposes the non-credit requirement? Yes, sir. Could you be more specific about that? I'll try to be, yes. But what I would like to do is point, if I may, to what Mr. Feng's counsel said to the district court during oral argument. Because this question, of course, came up. And in talking about the nine credits, and this is at A314, the court said the government wanted him to take at least three courses. And the response was right. And then on A315, the court asks again, the university did not require the similarly situated students to take these courses. It was, again, the government required him if he wanted to stay in the United States. And the response to that was, that's correct. That's correct. And you see that it's on A315. Who is responding that's correct? Mr. Feng's counsel in the middle of A315. So what is the federal immigration law? What are you referring to? Does it really require that you be a full-time student? Or is there something more specific than that? I can only tell you what's in the record, Your Honor, because the plaintiff did not take any sort of discovery on what the immigration requirement would be or have an expert or otherwise point to a statute that would say otherwise. What the university official said is that in order to be enrolled and participate in classes in the US, you must be a full-time student. And that that equates to nine credits during the fall and spring. That the nine credit requirement does not exist during the summer. And there's also reference in the record, too, and there can be a one-time, what I understand to be a one-time exception, to reduce the nine credit requirement, which is exactly what happened in the spring of 2015. After Mr. Feng was unenrolled and he was allowed to try to continue to make progress in the spring of 2015, he was enrolled in only two courses. It sounds like Ms. Denzel agrees with you, but I'm still curious, from what does that requirement stem? So I cannot give you a site. I can tell you that it is a requirement, as I understand it, in order for him to be resident in the US as a student under his F-1 visa. Well, I understand that you have to certify that he is there taking courses in a graduate program. You have to verify that. But I didn't know that you had to verify how many course credits he's taking at any given semester. That's why I'm asking, where does that come from? Yes, sir. And the difficulty is that the testimony, and the only undisputed testimony in this case, comes from university officials who say that's so. And below, that was not challenged. Is the testimony of the university that their students would normally only be required to take one course in the fall and one course in the spring? The students in this program, sir? Yes, sir. Yes, sir. Well, you don't consider that to be unequal treatment? No. Here's why. A couple of things. Number one, there's been reference to those other members of the program as being full-time students. That's not true. They were fully employed teachers, for the most part, and they took one course a semester. So they were part-time students. And what you will see in this record here, sir, is that Mr. Fang was told that he did not have to participate in these classes in person in Newark, Delaware, after that first summer. That's, as I said when I first began, Dr. Joyce said that when he first met with Mr. Fang, he explained precisely that. The program was intended for remote participation. The program was intended for one class for the fall and the spring. He was treated precisely the same way as everybody else in that cohort. And the only difference, which is fine, is that Mr. Fang wanted to participate in person. That's fine. But that then implicated the immigration requirements, that in order for him to do that and to be there, and he's told this very early on in the process, you're going to have to enroll in nine credits. There is another, Your Honor, I believe asked my friend if there was another international student in the program. And there was, as I understand it, not with his cohort, but there was with the next cohort, a student from Turkey. And the plaintiff took no discovery on that and whether or not that individual took classes in Newark. But if the plaintiff had, the plaintiff would have understood that the same exact requirements applied. If that student chose to take courses in Newark, that student was going to have to have a full course load in order for the certification for the F1 to be upheld. Well, again, Ms. Denzel apparently doesn't disagree with you that Mr. Fang had to take nine credits, three courses, three credits each. And that, you say, is an immigration requirement. Yes, and the big disconnect, and I read it time and again in the... I'm lost. Because if we don't know what the source of this is, isn't the immigration requirement that you be considered a full-time student? I will tell you I understand yes. So if Delaware, to be a full-time student, doesn't require three courses of three credits each per semester, it can only be federal law, but you haven't... nobody tells us where it is. I'm sorry, if I've misstated it, I apologize, let me fix it. The university, to be a full-time student, it requires, as I've been explained and as exists in the record, nine credits. Nine credits to be a full-time student. What about in this program? Because they're only requiring one course in the fall semester and one in the spring. Sorry, three credits, one class. This is not a full-time program. In the graduate program, you have to take one course, three credits. Yeah, let me try to unpack it. I'm sorry if this is confusing. In order to be enrolled in this program, you need only do two things. Show up for the first summer and take six credits. Thereafter, one course a semester for three credits each. That's the full requirement in the program. And the testimony, undisputed in the record, from Dr. Joyce is that A, it was intended for individuals who were otherwise fully employed. These are teachers who are getting an advanced degree. So that's why it's a part-time program, not a full-time program. Two, that Mr. Fain could have participated in the program as a part-time student. He chose not to. How could he have participated in the program as a part-time student? He could have done that remotely from overseas, from China or somewhere else. What's the difference in terms of caseload, part-time, and full-time? What's the difference in terms of course load? So for a credit requirement, one class for three credits versus three classes for nine credits, certainly nine credits is more work. And you say he had an option, but he chose the three-course, three-credit program? Correct, sir. That was his decision? 100%. Here's why. He did not have to take these courses in Newark. I know that sounds strange, right? It's a graduate program. What do you mean he doesn't have to be there? The testimony from Dr. Joyce, who created the program, said that's what it was designed for. And there's a reference, and I'll find it in a second, in Dr. Joyce's deposition when he said that that was the first conversation he had when he met with Dr. Fain to say, we'd love to have an international student in this program. Do you understand who this was set up for? It was set up for a full-time teacher. In other words, a teacher who would be overseas, wherever that might be, participating remotely. In the same way that, as I said, Your Honor, that the teacher in New York, who was a part of this cohort, came to Newark, Delaware for the first summer and only the first summer, and thereafter not again. In that case, in that situation, the university has treated everyone the same way. And it is just wrong, as my friends keep saying over and over and over, to suggest that it was the university that imposed a nine-credit requirement on him if he chose to be a full-time student. And I think the record makes very clear. Mr. Fain wanted to be in the U.S. He'd gone to California, he'd come back to Newark, he wanted to be in the U.S. That's his choice if he can do that under the immigration laws. That has nothing to do with the program to which he was admitted, which was a part-time, one class after the first summer program. So you say there was no obligation whatsoever imposed on Mr. Fain to take three courses, three credits each. He had a choice. He had a choice. So the choice of the nine-credit, I guess that's what it is, three courses, nine credits, that was his and his alone. Correct. It wasn't imposed on him by the university. One hundred percent. The only thing the university said to him was, if you choose to take classes in person in order to continue in this program, you must take nine credits. That starts with a massive if that is the whole difference in this case. The if was him, Mr. Fain, who made that decision, not the university. And that's, to me, the big disconnect. As for the distance learning, though, once he had a 1.2 GPA, Was it 1.2 or 1.6? 1.26, I think. I thought it was 1.26. He couldn't have participated from China on a one course, three credit. At that point, he was deemed unfit, correct? Yes, sir. Well, once he had a subpar below 2.0 GPA, our argument is that he was not an otherwise qualified student under the McDonnell-Douglas analysis. That's correct. So when you say he had the option of taking one course and staying in China, that would have been triggered if he had started the program in the summer like the others and then went into a distance learning modality like the others. Yes, sir. That's correct. And that distance learning modality could have been for people in New York, Colorado, London, Beijing. Anywhere in the world, sir. And in fact, it happens to be, and this is in the record, that at the very beginning of the summer program, where everyone is required to be there in Newark in person, Mr. Feng had a separate unrelated immigration issue that required him to go home. And he went home. And therefore, he participated in the first week or two via remote access. So it strikes me as interesting that we're hearing that the university was discriminating against him because of his international status. I think the record demonstrates that time and again, he got more than what the other students got. He received the opportunity to participate via video, even when in-person attendance was asked for and the other students did that. And Dr. Martin and the district court found this, said that she gave him an extraordinary opportunity to try to continue and to make up the work that he missed and to try to get his GPA up in a way that she said, I wouldn't have done for other students. And there's no reference and no allegation and no facts in the record to suggest that any other students got better treatment than that. In your briefing, you state expressly that comparator evidence is a requirement for a discrimination case. Yeah. If I could redo that, I would. It's certainly one way. It's a factor. And it's... Anderson makes it a factor, but it's not a... Correct. Anderson makes it a factor, Your Honor. You're exactly right. And I think the reason why we have focused that way and I think why the district court focused that way is because we don't have a direct evidence case. And I don't think you have other incidents of circumstantial evidence pointing to discrimination here. If I may, just on a second, I'm out of time. No, you're fine. If you look at the Anderson case, I think it's very instructive. I mean, there you had, in a lending circumstance, you had, number one, past experience where I believe African-American borrowers had been issued loans by Wachovia in the past and now not issued loans. You had... They were apparently borrowing from Wachovia to live in a traditionally African-American community and now they're seeking a loan in a traditional Caucasian community. And you had references to inappropriate comments, or at least allegations in the record, of inappropriate comments by Wachovia lenders. All of those together, even there, the court said, that might satisfy the element for a prima facie cause of discrimination. And then the court, in my view, very quickly went on to the next steps and said, but there are regulations at play that very clearly create the non-discriminatory reason for this. You haven't satisfied pretext. And we think, Your Honor, that that's the case here, that under the McDonnell-Douglas analysis, which we think is the right one, that the district court got it right, the university is entitled to summary judgment. Okay, any further questions? Judge Hardiman? No. Thank you. Ms. Denzel? Do you answer Judge Hardiman's... Ms. Denzel. Do you agree with Mr. Taylor that the decision to take three courses, nine credits, was entirely Mr. Fang's and his alone? I don't. And the first point I want to make, with respect to that point, is that that's not an argument the University of Delaware raised in the motion for summary judgment. They did not note that until their reply. It wasn't a reply authorized by the court, and we didn't have an opportunity to respond. Had we, Mr. Fang would have pointed out that the week or two that he participated at the beginning of the program remotely was very challenging, as described by Dr. Joyce, with respect to technical difficulties and video issues. When Mr. Fang went back to China after the I-20 issue, he was unable to return. He had substantial difficulty accessing his email because of the Chinese firewalls. He could not consistently get resources. Well, let's talk about the ninth course. You say it was an imposition by the university. Is that correct? That is what he was told. Yes. Mr. Fang was told by the university that they require him to take it. But that's contrary to your... Respectfully, that's contrary to your brief at page five. Footnote number one says F-1 visa holders are required to take at least nine credit hours during the fall and spring terms, and at least three credit hours in the summer. So you yourself in your brief acknowledge, as is true, as I understand it, that this is a requirement placed by the federal government on F-1 visa holders. So that's the requirement as presented by the University of Delaware. It's actually a full-time... Wait, wait, wait. That is not what your brief says. Your brief does not say the University of Delaware argued erroneously that F-1 visa holders are required to take nine credits. You say precisely the opposite. You tell us, and now if you want to tell us that footnote one is incorrect, please do so and show us why it's incorrect. But when I read your brief, I accepted that as true in the same way that Mr. Taylor accepted it as true when he stood up and argued. So we agree with Mr. Taylor that in terms of the record, because that was not heavily argued by either side, that that's what's in the record. And so that's what we have to rely on. We cannot disagree with that in terms of that's what the University of Delaware is saying. However, our issue is... You're saying you're stuck with that. Yes, we have to accept that the University of Delaware says that it's nine credits for the F-1 visa. And the issue is that Mr. Fang was presenting this full-time. That's not what you're saying. That is your position. That's not necessarily entirely what the... The University is saying there was a choice. And Mr. Fang exercised a choice. Let me see if I can add to this. Because my understanding... And correct me if you think I'm wrong. He starts in the summer. He takes two courses. He does fairly... B and a B+. End of the fall, they realized that the structure of the program, taking one course, wasn't enough to satisfy his F-1 visa requirements. In order to maintain the full-time status necessary for his visa, he'd have to take three classes per semester, not one. His advisor suggested that he should do an independent study instead of a third class. But he declined this. And then he fell significantly behind and failed to submit the required assignments by the end of the semester. So his GPA dropped to 1.26. He was dismissed. But then I understood that Mary Martin, the administrator in charge of implementing the academic policy program, conferred with Dr. Joyce. And the two came up with proposed terms for reinstatement. And the terms were to contact the professors that in the courses he failed to complete, requesting permission to complete them later, take two courses in the spring semester, and meet weekly with Dr. Joyce. Mr. Fang agreed, and he was reinstated for the spring. So now he's back in, and he later testified he didn't understand the first condition, that he thought he had a long time in order to get the permission to complete the requirements from the professors when in fact it was less than a long time. It sounds like the university's trying to work with him, not against him. I don't see the intention. I don't see any kind of discrimination. Dr. Joyce was certainly willing to work with him. He was the one who brokered the agreement. It was Ms. Martin who had dismissed him originally. The agreement that was brokered did not include a time frame for when he needed to complete that work. It included a time frame for the courses he was going to take the next semester. That could be a misunderstanding, but usually you and I, we've all been, if you, a lot of schools won't allow you to take an incomplete now, which I didn't realize. I teach undergrad. And they'll, except for very, you know, good reasons. Used to be you'd get an incomplete for, like, in December and you'd just complete it in January. But you can't wait until next May to complete it. So that wasn't specified in the agreement. And I think the conduct of the parties indicate that that wasn't intended by the agreement. Dr. Joyce emailed Mr. Fang on July 2nd, well after the spring semester ended, reminding him to continue to work on that work and noting for him that if it wasn't done, he couldn't enroll on July 6th in those summer classes. It didn't say he'd be dismissed from the program. One of the UD professors took the work that he turned in in December 2015 But if you're under a 2.0, you do get dismissed. And he's way under the 2.0. Only because he was given the zeros for that fall coursework, which Mr. Fang understood was still in an incomplete or holding status because of the agreement. That the agreement that he entered replaced the policies under which the students were operating. That was now his agreement, his requirement for continuing in the program. And neither he nor clearly Dr. Joyce understood it to say he had to complete all of that work by the end of the spring. But how does this rise to the level of being either intentional or indirect discrimination? So the discrimination that comes after that is Ms. Martin's dismissal of him despite the agreement. When she dismissed him, she did not look to see whether he complied with the agreement. She admitted that she didn't bother to check with Dr. Joyce as to whether he had complied. She claimed that he had given no explanation whatsoever for why he had struggled in the fall at all or why it was taking him a longer time, which is of course not true. And so in presenting their reason, Ms. Martin testified to a number of things that are demonstrably inaccurate, which suggests then that the actual reason for their actions, much like an employment discrimination case, was impermissible. And that they found him, there are no evidence because of his continued pestering in their minds. And so it's what Ms. Martin did after that agreement and the failure to honor that agreement and that breach of contract there that factors in and the way it was done and that I-20 issue. How many foreign students, forget not just Chinese, but how many foreign students are in this program? So my understanding is the program doesn't exist anymore. As far as the record goes, none were in it at the time that he was in it. My understanding is the University of Delaware said there was one from Turkey after, but I don't know about any other numbers. It was a time-limited program for reasons I don't know. In sum, you say that the district court properly used the McDonnell-Douglas analysis, but reached the wrong result? Yes. Because of the comparators and the time at which the qualification, the comparators need to be judged. So it needs to be before any of the discriminatory actions occurred, and it needs to take into consideration the contract and the agreement under which he's acting. So what are you asking us to do? To reverse the district court's judgment and to directly, to properly Is it a reverse or a vacate? I mean, we reverse it because comparator evidence was required. It's not necessarily an element, but the question then becomes, even if you take out the comparator evidence and use it as a factor rather than an element, how does he win? Mr. Fenn? By the other evidence that he cited of discrimination by the I-20 and the purposely withholding that, knowing he'd go to China and be unable to return. They sat on that for two months, well beyond the end of the semester, well beyond what they said or claim now at the end of that contract. There was no reason to do that, to mislead him, or to take advantage of that, other to ensure that they could get rid of him. What he said was, when he departed in the spring of 2015, he asked the school to sign the I-20 immigration form, and he claims he was advised that it would be sent to him in China once completed. Then once he got back, instead of a signed I-20 form, he received a dismissal letter in July of 2015. Right. He never came back because he never received the I-20. He was barred from re-entering the United States. That all? He couldn't go to another university? At this time, he cannot. He's still in China. He certainly can't return to go to this program. He would need a valid student status to do so. The program doesn't exist anymore, you're telling me. That's correct. I don't know what the status of the various offerings of the University of Delaware are right now, but I'm sure they have something similar. Any further questions? Ms. Denzel, were you involved in any of the briefing in this case? I came in late in the game, primarily in the appeal stage, so I'm going to be honest, I don't remember the precise time. I was not involved at the summary judgment stage. Were you involved in any of the briefing in this case, on appeal? On appeal. Did you work on the opening brief or the reply brief? Honestly, I can't recall if I worked on the opening brief. I believe I worked on the reply brief. Are you with the Bok Law Firm? I work in conjunction with them on a contract basis on occasion.  today. Are you employed by the Bok Law Firm? As a contractor, sir. So you're not an employee, you're an independent contractor? That's correct. And Mr. Bok, who wrote the brief, or at least his name's on the brief, he's a member of the Third Circuit Bar? Yes, as am I, sir. In order to do this argument. Alright, thank you. Thank you very much. Thank you to both counsel. We'll take the matter under advisement.